UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| REGUS MANAGEMENT GROUP, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:07-CV-1799-B |
| | § | |
| INTERNATIONAL BUSINESS | § | |
| MACHINE CORP., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION

This is a breach of contract, fraudulent inducement, and fraud action. Defendant International Business Systems Corporation ("IBM") moves, pursuant to Federal Rule of Civil Procedure 12(b)(6), to limit the type of damages potentially available to Plaintiff Regus Management Group LLC ("Regus") if Regus prevails on its fraudulent inducement and/or fraud claims. IBM argues that the limitation of liability provision in the agreement between the parties–an agreement alleged to have been fraudulently procured–is nonetheless binding on Regus, precluding it from recovering exemplary or lost profit damages. Defendant also moves to dismiss Plaintiff's alternative fraud claim as barred under the Texas law by the economic loss doctrine, which essentially precludes a party from being liable in tort and recovering tort damages for what is more accurately characterized as a contract claim.

Having considered Defendant IBM's Partial Motion to Dismiss Plaintiff's Cause of Action for Fraud and Prayer for Exemplary Damages and Lost Profit Damages (doc #10) and Memorandum in Support, Plaintiff Regus' Response Thereto, Defendant's Reply and all evidence and arguments

submitted, the Court finds that the Motion should be DENIED.

## BACKGROUND

The Court takes its factual account from the Plaintiff's Original Complaint filed on October 25, 2007. Plaintiff Regus is a provider of workplace solutions, operating hundreds of business centers globally that enable clients to walk into any given location and have a remote office with everything they need to immediately begin working. (Compl. ¶¶ 5-6). Prior to contracting with IBM, the information technology ("IT") infrastructure used by Regus was decentralized with each business center housing its own hardware and software. (Compl. ¶ 7). In Spring 2004, Regus decided to change that structure to centralize its IT network and operations and developed a Request for Proposal outlining its specific requirements. (Compl. ¶ 8-9).

Regus entered into discussions with IBM around October 2005 regarding IBM's ability to help Regus centralize its IT network and operations. (Compl. ¶¶ 10, 16). IBM proposed a Converged Network Services solution ("CNS") used on a global basis with necessary hardware and software housed at "head-end" facilities that would act as hubs in the Regus network. (Compl. ¶¶ 12-13). IBM proposed to design, implement, and manage those hubs, including the provision of post-implementation technical support. (Compl. ¶ 14). IBM also represented that it would be using Cisco's Hosted Unified Communications Services ("HUCS") platform to deliver the voice, data, and video services to each Regus business center. (Compl. ¶ 15).

In discussing its capabilities with Regus, IBM made various representations about the abilities of its CNS solution to perform certain tasks that were both desirable and necessary from Regus' perspective to have a competitive product for its customers. (Compl. ¶¶ 16-17, 20, 23). For instance, IBM promised to provide Regus with an Automated Provisioning Tool ("APT"), which it

said would allow Regus and its customers to remotely choose and configure the voice, data, and video services desired at any given location. (Compl. ¶ 17). IBM represented that, within ninety (90) days of the parties executing a contract, as part of the APT, it would be able to customize and expand a generic provisioning tool called VisionOSS to automatically provision both data and voice services. (Compl. ¶¶ 20, 34). The APT was important to Regus because its customers could then easily sign-up for additional services that could be implemented immediately using the centralized CNS solution, instead of being manually implemented at each business center, as Regus had been doing under its then-current system. (Compl. ¶¶ 18).

In discussing its HUCS platform, IBM also made several representations upon which Regus relied in choosing IBM as a service provider. (Compl. ¶¶ 38-39). IBM represented that the HUCS platform was capable of supporting the functions required by Regus, including multi-country dial plans, TEHO, LCR, desktop faxing, and autoprovisioning. (Compl. ¶¶ 16, 39). IBM also said that Cisco had certified that the HUCS platform and other IBM hardware configurations could support the specific requirements of Regus. (Compl. ¶ 39).

IBM represented that it could provide a complete CNS solution including all of the functionality concerning the APT and the HUCS platform within twelve (12) months of executing an agreement. (Compl. ¶ 34). IBM noted that it had a scalable process that had been used for five years with a number of customers, so it could implement the CNS solution at 275 sites in the promised time frame. (Compl. ¶ 44). Because this was a global project, Regus also wanted to ensure that the pricing agreed with IBM in the United States would be extended globally, including to regional IBM affiliates. (Compl. ¶¶ 42-43). IBM indicated that the pricing terms in the U.S. contract would be honored worldwide. (Compl. ¶ 42).

On March 31, 2006, Regus relied on IBM's representations about its abilities, products, and time frame for performance, all of which were false when made, and entered into a Master Services Agreement ("MSA") and Global Statement of Work ("SOW") (collectively, the "Agreement") with IBM. (Compl. ¶¶ 25-26, 48). The Agreement and other associated documents set forth various requirements and representations and warranties by both parties, including deadlines for performance.

Under the Agreement, IBM was to deliver a project plan for Phase One (which included the installation of the head-ends in the U.S. and implementation of 48 sites by April 21, 2006), implement those head-ends by June 29, 2006 and deliver a project plan for installation of head-ends outside the U.S. by April 30, 2006 and implement those head-ends by August 1, 2006. (Compl. ¶ 58). IBM was also to complete Phase One by September 30, 2006. (Compl. ¶ 58). IBM was to complete implementation of the remaining 197 sites by April 1, 2008. (Compl. ¶ 65). IBM was also supposed to provide Day 2 support, which included technical support at Regus business centers. (Compl. ¶ 69).

IBM missed all of its deadlines, failed to provide the promised technical support, and refused to honor its agreement on global pricing. (Compl. ¶¶ 43, 65, 67-69, 84). Despite its initial failings, in August 2006, IBM represented to Regus that it had a plan in place to implement the complete CNS solution, as promised, by December 29, 2006. (Compl. ¶ 87). Throughout the second half of 2006, IBM represented that it had a validated solution that had been tested and that the HUCS platform would support Regus' worldwide requirements. (Compl. ¶¶ 87-90). According to Regus, at no time prior to February/ March 2007 did IBM disclose that the CNS solution, including the APT and the HUCS platform, could not perform the functionality IBM promised that it could during

contract negotiations and in the Agreement. (Compl. ¶¶ 35-36, 40). In reliance on IBM's promises both before it entered into the Agreement and after its execution, on August 31, 2006, Regus's UK affiliate entered into a Local Services Agreement in the United Kingdom ("UK LSA") with IBM's affiliate there to implement the CNS solution in Europe, the Middle East, and Africa. (Compl. ¶ 49). Regus charges that after execution of the Agreement, IBM refused to execute, or have its affiliates execute, key Local Services Agreements for the Asia-Pacific Region, as provided in the Agreement. (Compl. ¶ 81). IBM also delayed implementation of the UK LSA and refused to honor the global pricing agreement. (Compl. ¶¶ 82-83). IBM also threatened to deactivate the US headends unless Regus agreed to pay IBM money that was not yet due under the Agreement. (Compl. ¶ 85).

Regus terminated the Agreement on October 22, 2007 and filed this case on October 25, 2007 alleging claims of fraudulent inducement, breach of contract, and fraud. IBM answered on December 31, 2007 and filed a Partial Motion to Dismiss the Fraud Claim and the Prayer for Exemplary and Lost Profit Damages under Federal Rule of Civil Procedure 12(b)(6). IBM essentially argues that (1) Regus' request for exemplary and lost profit damages is barred by the terms of the Agreement and (2) Regus' fraud claim is barred by the economic loss doctrine because its claim sounds in contract and not tort.

## ANALYSIS

In analyzing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, the Court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff. *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004). Motions to dismiss under Rule 12(b)(6) are viewed with disfavor and are rarely

granted. *Priester v. Lowndes County*, 354 F.3d 414, 418 (5th Cir. 2004). A 12(b)(6) motion to dismiss should be granted only if the complaint does not include "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1969 (2007). The Court's review is limited to the allegations in the complaint and to those documents attached to a defendant's motion to dismiss to the extent that those documents are referred to in the complaint and are central to the claims. *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004).

**Plaintiff's Prayer for Exemplary Damages**[1]

As an initial matter, IBM does not contest that Regus has stated a claim for fraudulent inducement. IBM instead takes issue with the range of damages potentially available to Regus if it were to succeed on the inducement claim. IBM moves to dismiss Regus' request for exemplary and lost profits damages based on a limitation of liability clause in the Agreement. That clause is addressed below.

Article 16.3 of the Agreement provides, *inter alia*, that "neither Party shall be liable for consequential, incidental, special, exemplary and/or punitive damages, even if advised of the possibility of such damages and regardless of the form in which any action is brought." (Def's App. 69). IBM argues that because Regus never pled the remedy of rescission of the contract, it is thus limited to its apparent election to enforce the contract in seeking money damages for its fraudulent inducement claim. IBM further alleges that the money damages Regus has elected are benefit-of-the-bargain damages and therefore Regus must accept the Agreement, including the Article 16.3

---

[1] The Court uses the terms "exemplary" in its analysis herein as shorthand for both the exemplary damages and lost profits prayer.

limitation on liability, because that is what the parties negotiated.

The Court finds that Regus' failure to plead rescission is not dispositive. IBM argues that Regus can only avoid the limitation of liability clause in the Agreement if Regus exclusively elects the remedy of rescission - as opposed to seeking damages. The Court does not read the Complaint as narrowly as IBM. "A general prayer for relief will support any relief raised by evidence that is consistent with the allegations and causes of action stated in the petition." *Nelson v. Najm*, 127 S.W.3d 170, 177 (Tex. App.–Hous. [1st Dist.] 2003, pet. denied) (rejecting argument that rescission was not an available remedy for fraudulent inducement because it was not specifically pled). Rescission is a clearly an available remedy for a successful fraudulent inducement claim. "It is well settled that one who is induced by fraud to enter into a contract has his choice of remedies. 'He may stand to the bargain and recover damages for the fraud, or he may rescind the contract, and return the thing bought, and receive back what he paid.'" *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 676 (Tex. 2000) (citations omitted). Regus has prayed generally for any relief to which it may be entitled. (Conclusion and Prayer). At this early stage in the litigation, the Court will not read out of its prayer a claim for all legal and equitable remedies potentially available for each of its claims, including rescission.[2] Second, the Court does not agree that the limitation of liability provision is necessarily enforceable even if Regus is only seeking money damages for fraudulent inducement.

Accepting IBM's arguments would require the Court to find that, as a matter of law, the limitation of liability provision is enforceable even if was procured by fraud. The law does not

---

[2]Similarly, the Court does not agree with IBM that Regus is seeking only benefit-of-the-bargain damages. Regus' claims for damages are worded broadly and could be construed to encompass out-of-pocket damages and other measures as well. *See, e.g.*, Compl. ¶¶ 97, 101 and Conclusion/Prayer.

support such a finding. It is a fundamental principle of Texas law that "as a rule, a party is not bound by a contract procured by fraud." *Formosa Plastics Corp. v. Presidio Engineers and Contractors, Inc.*, 960 S.W.2d 41, 46 (Tex. 1998); *see also Prudential Ins. Co. v. Jefferson Assocs., Ltd*, 896 S.W.2d 156, 162(Tex. 1995) (noting that buyer is not necessarily bound to purchase something "as is" if his agreement to the purchase was fraudulently procured); *Dallas Farm Mach. Co. v. Reaves*, 307 S.W.2d 233, 240 (Tex. 1957) ("If one is induced to go through the form of making a contract because of some fraud...made by the other party...such that if he had known the truth he would not have given his assent, the contract may be avoided by him. There can be no real assent when it is induced by fraud.").

Nothing in Texas law requires the Court to enforce particular provisions in a contract that has been fraudulently procured. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177-181(Tex. 1999). In addressing the issue of whether a merger clause in a contract disclaiming reliance on all previous representations could bar claims of fraudulent inducement, the *Schlumberger* court focused on evidence of the parties' intent in including the particular clause in the contract. *Id.* at 180. The court noted that its decision was based on the specific evidence before it and that a fraudulent inducement claim is not categorically barred by a merger clause. *Id.* at 181.

Viewing the limitation on liability provision IBM seeks to categorically enforce against Regus in light of the instruction of the Texas Supreme Court in *Schlumberger* and its predecessors, the Court finds it inappropriate to limit Regus' possible damages as a matter of law. *See also Netknowledge Techs. LLC v. Rapid Transmit Techs.*, No. 07-10343, 2008 WL 681694, *1 (5th Cir. Mar. 11, 2008) (affirming district court affirmation of arbitration award as not manifestly against the law or exceeding the arbitrator's authority where arbitrator voided limitation of liability clause due

to fraudulent inducement of the entire contract); *Dunbar Med. Sys. Inc. v. Gammex, Inc.*, 216 F.3d 441, 454 (5th Cir. 2000) (holding that, under Texas law, a limitation of liability clause in a contract that is unenforceable as fraudulently induced does not preclude an award of punitive damages).

Regus' prayer for exemplary damages should only be dismissed if it appears that there are no facts asserted to sustain a claim that is "plausible on its face." *Twombly*, 127 S. Ct. at 1969. Regus has clearly stated a claim for fraudulent inducement. Exemplary damages are potentially available for a successful fraudulent inducement claim under Texas law. Tex. Civ. Prac. & Rem. Code §41.003(a). Lost profit damages are also potentially available for a successful fraudulent inducement claim under Texas law. *Formosa Plastics*, 960 S.W.2d at 50.

With no evidence before it of the parties' intent in entering into the limitation of liability provision in the Agreement, and certainly no evidence that Regus intended to effectively waive its right to pursue punitive damages in the event that the Agreement turned out to have been fraudulently procured, the Court does not find Regus barred as a matter of law from recovering exemplary damages. Thus, IBM's Motion to Dismiss Regus' Prayer for Exemplary and Lost Profits Damages is denied.

**Regus' Fraud Claim**

IBM also moves to dismiss Regus' fraud claim alleging that the fraud claim is barred as a matter of law by the economic loss doctrine. IBM argues that (1) Regus has not shown that any of the alleged fraudulent representations subsequent to the formation of the Agreement violated any extra-contractual, independent legal duty and (2) the only harm alleged by Regus is the economic loss that is the subject of the Agreement.

The Court agrees that when viewing the allegations as true and in the light most favorable

to Plaintiff, the allegations upon which Regus bases the claim it labels as "Second Cause of Action (Fraud)"(as distinguished from its First Cause of Action for Fraudulent Inducement) are post-formation of the Agreement. (Compl. ¶¶ 99-100). The parties entered into the Agreement in March 2006. (Compl. ¶¶ 25-26). Regus alleges that it relied on certain representations made by IBM in July, August, and October 2006 that were false when made and as a result Regus was induced to (1) continue paying IBM, (2) not terminate the Agreement prior to October 2007, (3) enter into Local Service Agreements with IBM affiliates, and (4) agree to Change Authorizations under the Agreement. (Compl. ¶¶ 87-91).

**Independent Legal Duty**

To succeed on a fraud claim, the plaintiff must plead and prove: (1) material misrepresentation made by defendant, (2) which was false when made, (3) with the intention that plaintiff rely on it, (4) upon which plaintiff did rely, and (5) which resulted in injury to plaintiff. *Formosa Plastics*, 960 S.W.2d at 47. An omission, or failure to disclose information, can constitute a misrepresentation when there is a duty to disclose information. That is, "silence may be equivalent to a false representation only when the particular circumstances impose a duty on the party to speak and he deliberately remains silent." *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001). "[W]hen one makes a representation, new information must be disclosed that makes the earlier representation misleading or untrue." *Hoggett v. Brown*, 971 S.W.2d 472, 487 (Tex. App.–Hous. [14th Dist.] 1997, pet. denied). "[E]ven in arms-length transactions, a duty to disclose arises if a party knows, or should have known, its prior statement was false." *Ralston-Purina Co. v. McKendrick*, 850 S.W.2d 629, (Tex. App.–San Antonio 1993, writ denied ); *see also Tempo Tamers, Inc. v. Crow-Houston Four, Ltd.*, 715 S.W.2d 658, 669 (Tex. App.–Dallas 1986, writ refused n.r.e.) (noting that failure to

disclose information can be fraudulent "where a party later learns that previous affirmative representations are in fact false.").

Regus has stated a claim for fraud based on both affirmative misrepresentations and omissions. With respect to affirmative misrepresentations, Regus has pled that IBM made statements in July, August, and October 2006 about the fact that it had a plan to fully implement the CNS solution by December 29, 2006, that it had a validated solution that had been fully tested, and that HUCS could support the type of dialing plan Regus required. (Compl. ¶¶ 87, 89-90). Regus has pled that each statement was false when made or made without knowledge of its truth, that it relied on the statements in not terminating the Agreement and in agreeing to amendments thereunder, and that it was injured when IBM did not fulfill its promises. (*Id.* and Compl. ¶¶ 99-101). Regus has also pled that IBM failed, until February/March 2007, to disclose that the APT and HUCS platform could not perform as IBM had originally represented prior to the execution of the Agreement and that is continued to rely on the original representations in continuing the Agreement and entering into the UK LSA. (Compl. ¶¶ 35-36, 40, 88-89). Considering Texas law on the duty to correct false information cited above, the omissions pled by Regus could potentially form the basis of the misrepresentation element of a fraud claim. The Court finds that Regus has pled each element of a fraud claim and notes that IBM did not object to the specificity of Regus' pleading.

**Economic Loss Doctrine**

IBM argues that because all of the misrepresentations alleged by Regus were made after the parties entered into the contract, they were all made in support of the Agreement and cannot, as a matter of law, form the basis of an independent tort action. The Court does not find that Texas law

necessarily allows a party who intentionally makes false representations to another party to hide behind a contract to protect itself from damages. It is clear under Texas law that mere failure to perform a contract cannot be the basis for a fraud claim. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986). However, the extent to which false promises and representations made during the course of an ongoing contractual relationship may be the basis of a fraud claim is unclear.

The economic loss doctrine, better described as the independent injury rule, essentially bars a plaintiff from attempting to convert a contract action into a tort action. In determining whether a claim can be brought as a tort, consideration must be given to (1) "the source of the defendant's duty to act (whether it arose solely out of the contract or from some common-law duty) and [2] the nature of the remedy sought by the plaintiff." *Crawford v. Ace Sign, Inc.*, 917 S.W.2d 12, 13 (Tex. 1996). If the defendant's duty arose independently of the fact that a contract exists between the parties, the plaintiff's claim is more likely to sound in tort. *Sw. Bell Tele. Co. v. DeLanney*, 809 S.W.2d 493, 495 (Tex. 1991). However, if the remedy sought by the plaintiff is only the loss or damage to the subject matter of the contract, the plaintiff's action is ordinarily on the contract. *Id.* at 494.

The Texas Supreme Court has further commented that, with respect to fraudulent inducement claims, even if the remedy sought is only recompense for an economic loss, the tort claim is not barred. *Formosa Plastics*, 960 S.W.2d at 47. The court held that as long as the plaintiff presented legally sufficient evidence of each element of fraudulent inducement, "any damages suffered as a result of the fraud sound in tort." *Id.* Although the Texas Supreme Court has not spoken directly on the tort of fraud, its commentary in *Formosa Plastics*–a fraudulent inducement case–is couched in terms of fraud. *Id.* at 46-47. Further, the *Formosa Plastics* court cited with

approval its prior opinions noting that a fraud claim can be maintained irrespective of whether a contract exists in certain circumstances, such as when a promise is made with no intention of performing. *Id. citing, e.g., Spoljaric*, 708 S.W.2d at 434.

Based on *Formosa Plastics*, the Court finds that the appropriate inquiry for a fraud claim, where the alleged fraud occurred in the context of a contract between the parties, also focuses on the source of the duty that is alleged to have been violated. If the basis of the tort claim is a legal duty that is independent of the existence of a contract, the tort claim can stand, at least for the purposes of this 12(b)(6) motion. *See also People's Choice Home Loan, Inc. v. Mora*, No. 3:06-CV-1709, 2007 WL 708872, at * 6 (N.D. Tex. Mar. 7, 2007) (refusing to dismiss negligence claim where plaintiff had alleged duty independent of contract); *Nazareth Int'l, Inc. v. J.C. Penney Corp., Inc.*, No. 3:04-CV-1265, 2005 WL 1704793, at *8 (N.D. Tex. Jul. 19, 2005) (refusing to dismiss fraud and negligence claims where plaintiff alleged facts to support a duty by defendant to correct its prior representations to plaintiff); *Eastman Chemical Co. v. Niro, Inc.*, 80 F. Supp.2d 712, 716-719 (S.D. Tex. 2000) (refusing to dismiss claim for fraud subsequent to contract formation).

Considering Regus' Complaint most broadly, as required in a Rule 12(b)(6) analysis, the Court could read the fraud claim in the Complaint (Count II) as essentially alleging that Regus was fraudulently induced to continue performance, to amend the terms of the Agreement, and/or to forego a legal right to terminate the Agreement. Texas courts have found a claim stated for fraud/fraudulent inducement under similar circumstances, such that this Court cannot find that as a matter of law, Regus' fraud claim is barred, even if the only damages sought are identical to the economic loss recoverable under a breach of contract claim. *See, e.g., Kajima Int'l, Inc. v. Formosa Plastics Corp. USA*, 15 S.W.3d 289, 292-294 (Tex. App.–Corpus Christi 2000, pet. denied)

(reversing district court refusal to submit jury question to allow consideration of fraud after execution of a written contract); *Am. Chiropractic Clinics, P.C. v. Spence*, No. 05-93-01971, 1995 WL 731786, at *6-7 (Tex. App.–Dallas Dec. 11, 1995, writ denied) (approving jury instruction on fraudulent inducement based on inducement to continue to perform a written agreement).[3] Because Regus has pled facts sufficient to state a claim that is both legally and factually plausible on its face, IBM's Motion to Dismiss Regus' fraud claim must fail.

## CONCLUSION

For the reasons detailed above, the Court denies Defendant's Partial Motion to Dismiss Plaintiff's Cause of Action for Fraud and Prayer for Exemplary and Lost Profit Damages.

**SO ORDERED.**

Dated: April 24, 2008

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE

---

[3] Because there is some authority to support considering Regus' fraud claim as a fraudulent inducement claim, which would fall under *Formosa Plastics*, at this stage in the proceedings, the Court does not decide whether ultimately the second half of the *DeLanney* inquiry would apply to this type of a fraud claim (precluding tort damages where the nature of the plaintiff's loss is economic damage to the subject of the contract) or whether the *Formosa Plastics* holding with respect to fraudulent inducement should also apply to common law fraud, such that any damages suffered as a result of the fraud sound in tort, even if they are purely economic losses.